J. S64010/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| RAYMARR DAQUAN ALFORD, | : | No. 475 MDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, November 19, 2014,
in the Court of Common Pleas of Lycoming County
Criminal Division at No. CP-41-CR-0001969-2012

BEFORE:  FORD ELLIOTT, P.J.E., WECHT AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED DECEMBER 16, 2015**

Raymarr Daquan Alford appeals from the judgment of sentence of

November 19, 2014, following his conviction of first-degree murder and

related charges.  We affirm.

> On July 9, 2012, Kevan Connelly was shot in
> Flanagan Park in Williamsport, Pennsylvania.  He
> died later that same day.  On April 30, 2014, a jury
> found [appellant] guilty of First Degree Murder,
> Conspiracy to Commit Murder, Possessing an
> Instrument of Crime, Recklessly Endangering
> Another Person, and Firearms not to be Carried
> without a License.  For First Degree Murder, the
> Court used 18 Pa.C.S. § 1102.1 and sentenced
> [appellant] to incarceration for a minimum of
> 50 years and a maximum of life.  For Conspiracy to
> Commit Murder, the Court sentenced [appellant] to
> incarceration for a minimum of 9.5 years and a
> maximum of 40 years.  The sentence for conspiracy
> is consecutive to the sentence for murder.

Opinion and order, 3/3/15 at 1 (footnotes omitted).

---

* Former Justice specially assigned to the Superior Court.

Post-sentence motions were denied on March 3, 2015, and this timely appeal followed. Appellant complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court filed an opinion.

Appellant has raised the following issues for this court's review:

A. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON FIRST DEGREE MURDER.

B. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON CONSPIRACY TO COMMIT MURDER.

C. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS PHOTOGRAPHIC AND IN-COURT IDENTIFICATIONS BECAUSE BOTH WERE TAINTED BY PRIOR TELEPHONE CONTACT WITH A PERSON PRESENT AT THE CRIME SCENE WHO HEARD RUMORS ABOUT WHO COMMITTED THE MURDER.

D. THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING COMMONWEALTH WITNESSES TO IDENTIFY PERSONS DEPICTED IN SURVEILLANCE VIDEO AND TO DESCRIBE THOSE PERSONS['] ACTIONS WHEN NEITHER WITNESS WAS PRESENT TO OBSERVE THE EVENT.

E. THE TRIAL COURT ERRED BY ADMITTING A RECORDED CALL AS SUBSTANTIVE EVIDENCE WHEN THE WITNESS NEVER ACKNOWLEDGED SHE MADE THE CALL AND WAS THUS NOT SUBJECT TO EFFECTIVE CROSS EXAMINATION CONCERNING ITS CONTENT.

F. THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST TO RESENTENCE BECAUSE 18 Pa.C.S.A. § 1102.1(a)(1)

> VIOLATES THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION.
>
> G. THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST TO RESENTENCE BECAUSE 18 Pa.C.S.A. § 1102.1(a)(1) VIOLATES THE EQUAL PROTECTION CLAUSE.
>
> H. THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST TO RESENTENCE BECAUSE 18 Pa.C.S.A. § 1102.1(a)(1) VIOLATES THE **EX POST FACTO** CLAUSE WHEN APPLIED TO APPELLANT.

Appellant's brief at 5.

After careful review, we determine that the trial court ably and comprehensively, with appropriate citation to the record and without legal error, disposes of each of appellant's issues on appeal, and adopt those opinions as our own. Specifically, appellant's issues A and B, challenging the sufficiency of the evidence to support his convictions of first-degree murder and conspiracy to commit murder, are addressed in the trial court's opinion of March 3, 2015, denying appellant's post-sentence motion, at pages 16 through 18. Issue C, challenging Braheem Connelly's identification, is addressed in the trial court's May 1, 2013 opinion disposing of appellant's pre-trial suppression motion. (Docket #21.) Issue D is addressed in the trial court's opinion and order of March 6, 2014, granting in part, and denying in part, appellant's pre-trial motion **in limine**, as well as its May 11, 2015 Rule 1925(a) opinion at pages 1 through 3. Issue E, regarding the admission into evidence of Anita Jackson's telephone call in which she

J. S64010/15

implicates appellant, is addressed in the trial court's May 11, 2015 opinion at pages 3 through 5. Finally, appellant's issues F through H, challenging application of the mandatory minimum sentence in Section 1102.1(a)(1), are discussed in the trial court's March 3, 2015 opinion at pages 18 through 25 (**see Commonwealth v. Brooker**, 103 A.3d 325 (Pa.Super. 2014), **appeal denied**, 118 A.3d 1107 (Pa. 2015); and **Commonwealth v. Lawrence**, 99 A.3d 116 (Pa.Super. 2014), **appeal denied**, 114 A.3d 416 (Pa. 2015), upholding the constitutionality of Section 1102.1).

Judgment of sentence affirmed.

Wecht, J. joins the memorandum.

Fitzgerald, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2015

- 4 -

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA--

COMMONWEALTH OF PENNSYLVANIA, :
:
:
v. :
: CR: 1971-2012; 1969-2012
QU MAR MOORE, :
RAYMARR ALFORD, :
Defendant : CRIMINAL DIVISION

## OPINION AND ORDER

Raymarr Alford (Alford) filed an Omnibus Pre-trial Motion on December 21, 2012. Qu Mar Moore (Moore) filed an Omnibus Pre-trial Motion on February 27, 2013. A hearing on both motions was held April 9, 2013. Due to the numerous issues raised, only the issues relating to the Motion to Suppress were addressed at the hearing.

*Background*

On July 9, 2012, at around 7:00 PM Kevan James Connelly (victim) was shot to death at Flanigan Park, 707 Memorial Avenue. Following the shooting, the victim's brother, Braheem Connelly (Connelly), was taken to Williamsport City Hall by the Williamsport Bureau of Police (WBP). The majority of Connelly's interaction with police at City Hall was recorded and, by stipulation of the parties, viewed outside the presence of the jury by this Court following the hearing. In addition, Connelly testified at the hearing in regards to his identification of the Defendants as the shooters of the victim.

Approximately two months prior to the shooting, Connelly became friends with a woman that was an ex-girlfriend of Moore. The woman warned Connelly that Moore in the past had problems with other men hanging out with her and showed him a Facebook picture of Moore. Connelly testified that he looked at the photograph for approximately seven (7) seconds and took

note because he knew there would be a problem in the future. One month later, the woman showed Connelly another picture of Moore and told him that he was her ex-boyfriend.

Prior to the night of the shooting on either July 3, 2012 or July 4, 2012, Connelly saw Moore at a basketball court. Connelly stated that he was going to fight Moore but that he was with his child. As a result, no altercation resulted from this interaction. Connelly was able, however, to see Moore for a couple of minutes.

Later, on July 7, 2012, at approximately 5:00-6:00 PM, Connelly and the victim were walking around High Street when they were approached by eight (8) individuals, one being Moore. Connelly was later able to identify another individual as Alford, who he had never seen prior to this date.[1] The victim exchanged words with Moore and they began fighting. Connelly began fighting for a couple of minutes until he saw Alford pull a gun and point it at his face. Alford or someone else also hit the victim with the gun. Connelly got his brother and they left the scene. A witness called police and Connelly and the victim were questioned by the WBP. Connelly and the victim were released and no charges were filed.

On July 9, 2012, Connelly met the victim after work at Flanagan Park, which was filled with a couple hundred people. Connelly and the victim were playing basketball when Connelly noticed one of the individuals he had been fighting on July 7, 2012. Connelly began to look around the park and saw Moore and Alford with two other individuals approaching him and the victim. As the Defendants walked toward Connelly they were patting their waists, which Connelly stated was a way to communicate that they were possessing firearms.

The Defendants began to argue with Connelly and the victim. After about forty (40) seconds, Alford pulled out a gun followed by Moore. Alford fired approximately four (4) shots,

---

[1] After the shooting death of the victim, Connelly identified Alford in a photo array but did not know his name.

while Moore fired approximately two (2) shots. The Defendants then fled the scene and Connelly went to the aid of his brother, who had received a gunshot wound to the chest.

Following the shooting, Connelly was taken to Williamsport City Hall. Connelly was in leg shackles because he had engaged in a fight with another individual after the police and ambulance had arrived at the shooting scene. Connelly stated that there were two shooters but that he did not know who they were and that he had never seen them before. Connelly stated that one of the shooters was a black male wearing a white shirt with jeans. The male had dark skin, short hair, a mustache, 5'7'' to 5'8'', and was thin. The other shooter was described as wearing a black shirt with jeans, shorter than the other shooter, and roughly between the ages of 21-23. In addition, Connelly was questioned by police about the fight that happened on July 7, 2012. Connelly stated that he did not know who was involved in the fight or why it had happened.

Based on reports from the crime scene, it was believed that an individual named "Mar Mar" was involved in the shooting. Agent Trent Peacock of the WBP prepared a photo array with Raymarr Alford, whose street name was believed to be "Mar Mar." The photo array consisted of six photos other than Alford. The photo used of Alford depicts a dark skinned black male with a mustache/facial hair, with short hair, and wearing a hoodie sweatshirt. Four (4) of the photographs in the array also consisted of dark skinned black males with facial hair, short hair, and wearing a hoodie sweatshirt. The two remaining photographs depicted similar individuals; however, they were wearing shirts and not sweatshirts. Connelly was shown the photographs, where he first flipped through them and then placed them all on the ground so he could look at them at the same time. After viewing the photo array, Connelly stated that he could not identify anyone and he also could not positively rule anyone out.

Following Connelly not being able to identify the shooter in the photo array, WBP informed him that the victim was deceased. Connelly was noticeably distraught and requested repeatedly to be allowed to leave City Hall. Connelly asked that his boss from work Jeffrey Shaffer (Shaffer) be contacted so that he could talk to him. Shaffer and Richard King (King), who was another boss of Connelly, arrived at City Hall.[2] When Shaffer first arrived he saw Connelly briefly and told him to do the right thing and not do anything on his own, which he believed was his mindset at the time. Connelly and King talked in an interrogation room, which was not recorded. King testified that he told Connelly to tell the police who the shooters were and not to do anything rash. After a few minutes, Connelly requested that King have the police bring the photo array back into the room. King was not aware of the photo array at the time and got police to bring it into the room. The police then began to record the interrogation room, which showed the police bring the photo array into the room and Connelly flip through a few of the photographs and immediately pull out one, which was of Alford. Connelly said the photo was of the shooter with the white shirt. When asked to sign the photograph Connelly first refused and then complied after being reminded that his brother was the victim.[3]

Police exited the interrogation room and left Connelly and King in the room. After police left, King gave his cell phone to Connelly and he made a phone call. Based on the conversation, it appears that Connelly called his cousin and he tells them that he talked to police and that he needs to see them. The conversation on the cell phone does not indicate any communication that would discredit Connelly's identifications of the Defendants.

Following the phone call, Connelly went outside to get air with King, Shaffer, and a police officer. Based on the video, it appears that the police officer outside was Agent Leonard

---

[2] Shaffer had contacted King to go to City Hall with him.
[3] Connelly originally said that he just could not sign the photo and that he would not be appearing at court.

Dincher of WBP. King stated that the officer outside did not say anything and that the name of the second shooter was given to Shaffer. Shaffer testified that it was quiet and that Connelly said unprompted "Qu Mar." Connelly was then taken back to the interrogation room where he discussed how he knew Moore and stated his full name as "Qu Mar Moore." Connelly was then showed a photo of Moore, which he identified as the second shooter.

At the hearing, Connelly stated that there were many reasons for him not initially telling police that he knew the shooters. First, Connelly did not trust the police and believed that they were not telling him the truth about the victim's status. Second, Connelly said that it was the victim's decision on whether they should talk to police and that he was going to wait until he could talk to him. Third, Connelly testified that where he comes from in Philadelphia, people get killed for talking to the police. Finally, Connelly stated that he wanted to talk to King and Shaffer before he told police the names of the shooters.

### *Whether the Photo Array of Raymarr Alford Was Unduly Suggestive*

The Defendants argue that Connelly's identification of Alford and Moore was the result of an improper photo array. "[A] photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification." Commonwealth v. Kendricks, 30 A.3d 499, 504 (Pa. Super. 2011).

> Whether an out-of-court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. We will not suppress such identification unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Id. (citing Commonwealth v. Burton, 770 A.2d 771 (Pa. Super. 2001). A photo array is not unduly suggestive if the suspect's photo does not stand out more than others and each person depicted in the array are of similar facial characteristics. Id. (citing Commonwealth v. Fisher,

5

769 A.2d 1116, 1126 (Pa. 2001). "The photographs in the array should all be the same size and should be shot against similar backgrounds." Id. (citing Commonwealth v. Thomas, 575 A.2d 921 (Pa. Super. 1990).

This Court has reviewed the photos used in the photo array of Alford. There are six (6) photographs besides the one of Alford. As stated above, Alford has dark skin, short hair, and a mustache/facial hair. Every photo in the array had individuals with dark skin, short hair, and a mustache/facial hair. All the photographs are of the same size and have a blue background. The only true distinguishable feature of all the photographs is the clothing the individuals are wearing.[4] The Court finds that he photo array is not unduly suggestive and does not create a substantial likelihood of misidentification.

In addition, the Defendants allege that Connelly did not have an independent basis for an in-court identification if the out-of-court identification was deemed tainted. "The factors a court should consider in determining whether there was an independent basis for the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. Id. at 506. As the Court did not find the out-of-court identification to be suggestive, this issue will not be addressed by the Court.

The Defendants would like to emphasize that Connelly first stated that he did not know who the shooters were and that he was in contact with other individuals besides police prior to making the identifications. First, there is no indication or evidence that Connelly was told to identify the Defendants, either from the police or from a civilian. Second, any suggestion that

---

[4] Two (2) of the photographs have individuals wearing shirts, while the remaining photographs have individuals in hooded sweatshirts.

Connelly's identification is not reliable is a question for the trier of fact. The Court is evaluating the identification procedure used by WBP and not whether Connelly is a reliable witness. Therefore, after considering all the evidence presented at the suppression hearing, the Court will not suppress Connelly's identification of the Defendant.

### Whether the Photo Array of Qu Mar Moore Was Unduly Suggestive

The Defendants argue that the police giving a single photo of Moore was unduly suggestive and should be suppressed. This is not a situation where the witness saw the assailant but did not know who the individual was. Connelly had identified "Qu Mar Moore" as the second shooter. Connelly supplied police with the full name and detailed multiple occasions where he had seen Moore, besides on the day of the shooting. Connelly's identification of Moore was unprompted by any questions made by police and was independent of a photo array. Connelly had identified Moore prior to being shown a single photograph of him. Therefore, the Court cannot find that the identification of Moore was unduly suggestive.

Circulated 11/24/2015 02:47 PM

## ORDER

AND NOW, this ___1st___ day of May, 2013, based upon the foregoing Opinion, the Court finds that the identifications by Braheem Connelly of Qu Mar Moore and Raymarr Alford were not unduly suggestive. Therefore, the Defendant's Motion to Suppress is hereby DENIED.

By the Court,

Nancy L. Butts, President Judge

xc: DA
   PD
   Don Martino, Esq.
   Eileen Dgien, Dep. CA

8

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | CR-1969-2012 |
| v. | : | |
| | : | |
| RAYMARR DAQUAN ALFORD, | : | CRIMINAL DIVISION |
| Defendant | : | |

## OPINION AND ORDER

On November 12, 2014, the Defendant filed a timely Post-Sentence Motion. A hearing on the motion was held on December 29, 2014.

## I. Background

On July 9, 2012, Kevan Connelly was shot in Flanagan Park in Williamsport, Pennsylvania. He died later that same day. On April 30, 2014, a jury found Raymarr Alford (Defendant) guilty of First Degree Murder,[1] Conspiracy to Commit Murder,[2] Possessing an Instrument of Crime,[3] Recklessly Endangering Another Person,[4] and Firearms not to be Carried without a License.[5] For First Degree Murder, the Court used 18 Pa.C.S. § 1102.1 and sentenced the Defendant to incarceration for a minimum of 50 years and a maximum of life. For Conspiracy to Commit Murder, the Court sentenced the Defendant to incarceration for a minimum of 9.5 years and a maximum of 40 years. The sentence for conspiracy is consecutive to the sentence for murder.

---

[1] 18 Pa.C.S. §§ 2501, 2502(a).
[2] 18 Pa.C.S. § 903(a)(1).
[3] 18 Pa.C.S. § 907(b).
[4] 18 Pa.C.S. § 2705.
[5] 18 Pa.C.S. § 6106.

## A. Witnesses Called by the Commonwealth

### 1. Officer Joshua Bell's Testimony

Joshua Bell (Bell) is an officer with the Williamsport Bureau of Police. On July 9, 2012, he was stopped by a woman, who pointed to Flanagan Park and said that somebody had been shot. Bell went to the area where the woman had pointed. He saw 150 to 200 people in a half circle around a person lying on the ground.

### 2. Officer Eric Houseknecht's Testimony

Eric Houseknecht (Houseknecht) is an officer with the Williamsport Bureau of Police. On July 9, 2012, he saw a crowd in Flanagan Park. In the crowd, he saw a man trying to lift up another man, who was lying on the ground. Houseknecht did a brief medical examination of the man on the ground. The man's eyes were rolled back, and Houseknecht felt a very faint pulse. He could not tell if the man was breathing. Houseknecht noticed that there was a wound on the man's abdomen. An ambulance came and took the man to the hospital.

### 3. Corporal Dustin Reeder's Testimony

Dustin Reeder (Reeder) is an officer with the Williamsport Bureau of Police. On July 9, 2012, Reeder saw a crowd around person lying on the ground in Flanagan Park. A person led Reeder to an area next to fenced-in tennis courts. The person pointed out shell casings on the ground. Reeder found six shell cases in total. Four cases were .45 caliber. Two were .40 caliber. Reeder also found a bullet on a basketball court.

### 4. Braheem Connelly's Testimony

Braheem Connelly is the younger brother of Kevan Connelly. Braheem Connelly met a girl and was told that the girl's ex-boyfriend was looking for him. He asked the girl to get her

2

ex-boyfriend on the phone. On the phone, Braheem Connelly argued with the ex-boyfriend, Qu Mar Moore.

On July 7, 2012, Kevan Connelly and Braheem Connelly were walking on High Street in Williamsport. Braheem Connelly noticed that a group of approximately eight males were following them. Both the Defendant and Qu Mar Moore were in the group. There was an argument, and Kevan Connelly and Qu Mar Moore started fighting. When Braheem Connelly went to help Kevan Connelly, everybody started fighting. The Defendant waved a silver and black gun and hit Kevan Connelly in the face with the gun. When the police arrived, everybody ran.

On July 9, 2012, Braheem Connelly got off work around 6:30 P.M. He spoke with Kevan Connelly and agreed to meet him at Flanagan Park. When Braheem Connelly got to the park around 6:40 P.M., Kevan Connelly was already there playing basketball. Braheem Connelly started playing basketball. About 10 to 15 minutes after Braheem Connelly got to the park, Kevan Connelly and Braheem Connelly were approached by four males. The Defendant and Qu Mar Moore were in the group of four. A light-skinned black person with cornrows was also in the group. The Defendant was wearing a white shirt and blue jeans. Qu Mar Moore was wearing a black shirt and black jeans. The Defendant and Qu Mar Moore were patting their waists as they approached the Connelly's.

Braheem Connelly and Qu Mar Moore argued for a minute or two. When Braheem Connelly realized that the Defendant and Qu Mar Moore had guns, he tried to pull Kevan Connelly away from them. Braheem Connelly saw the Defendant pull a silver and black gun from his waist. It was the same gun that the Defendant waved on High Street on July 7, 2012. He also saw Qu Mar Moore pull a black revolver from his waist. The Defendant pointed his gun

3

at Braheem Connelly and Kevan Connelly and fired the gun three or four times. Braheem Connelly saw a bullet hit Kevan Connelly in the chest. Qu Mar Moore also fired his gun two or three times at Braheem Connelly and Kevan Connelly. After the shots, the Defendant, Qu Mar Moore, and the two other males in the group ran away.

## 5. Kenneth Williams' Testimony

Kenneth Williams (Williams) knew Kevan Connelly, Braheem Connelly, Qu Mar Moore, and the Defendant. On July 7, 2012, Kevan Connelly and Braheem Connelly went to Williams' house, where Kevan Connelly told Williams about the fight on High Street.

On July 9, 2012, Kevan Connelly left Williams' house around 6:15 P.M. to go to Flanagan Park to play basketball. Braheem Connelly came to Williams' house around 6:25 P.M. Braheem Connelly asked to use Williams' phone to call Kevan Connelly. After Kevan Connelly told Braheem Connelly about an altercation, Braheem Connelly went to Flanagan Park to see if Kevan Connelly was alright and to play basketball.

Williams left for the park shortly after Braheem Connelly left. Williams saw Kevan Connelly at the park. Williams played basketball on one half of a court while Braheem Connelly and Kevan Connelly played on the other half. Williams heard an argument while he was playing basketball. Kevan Connelly and Braheem Connelly were arguing with the Defendant, Qu Mar Moore, Stacey Cooley (Cooley), and a light-skinned black male with twisties in his hair. The Defendant was wearing a gray shirt, and Qu Mar Moore was wearing a black shirt. The male with twisties was wearing a white shirt. The Defendant and Qu Mar Moore wanted Kevan Connelly and Braheem Connelly to go into an alley, but the Connelly's said no. Kevan Connelly threw a punch at the male with twisties. Williams saw the Defendant pull an all black semi-automatic gun from his waist. The gun was not silver and black. Immediately after the

4

Defendant pulled the gun, he fired shots towards Kevan Connelly, Braheem Connelly, and Williams. Williams did not see anybody else with a gun.

### 6. Shareef Thompson's Testimony

Shareef Thompson (Thompson) knew the Defendant, Qu Mar Moore, Cooley, and Rayvonne Enty (Enty). Shakeem Taylor (Taylor) gave Thompson a Chrysler Town and Country mini-van, so Thompson could use it to sell drugs.

On July 9, 2012, Thompson picked up Enty at a hotel and went to the Defendant's house. Thompson, Enty, the Defendant, and Cooley left the Defendant's house. The Defendant, Enty, and Cooley were passengers in the van as Thompson drove around the area. At about 6:00 P.M., Thompson parked the van at Flanagan Park. Thompson, the Defendant, Cooley, and Enty exited the van. As they were entering the park, Kevan Connelly approached them. Kevan Connelly was yelling that the Defendant had pulled a gun on him, and Kevan Connelly wanted to fight. Tamika Burks came over and told them not to fight. People were still arguing as Thompson got back into the van. Thompson was in driver's seat when the Defendant came to passenger side, opened a dashboard compartment, and grabbed a gun from the compartment. As the Defendant was pulling the gun from the compartment, Thompson saw a man on a porch, so Thompson took the gun from the Defendant and put it in between the van seats. Thompson told everybody to get back in the van because a man had seen the Defendant with a gun. The Defendant, Cooley, and Enty entered the van, and Thompson drove from the park. The four went to 619 Second Street, which is a two to four minute drive from Flanagan Park. Once on Second Street, everybody got out of the van. Enty went to the back of the van and used a t-shirt to wipe the gun that the Defendant had grabbed.

5

Thompson did not stay long at Second Street. He entered the van and left to sell drugs. Thompson called Qu Mar Moore and told him that there was a confrontation in Flanagan Park and Moore needed to go to the park. Thompson returned to Second Street about 25 minutes after he left. The Defendant, Cooley, and Enty asked Thompson to drive them back to Flanagan Park. Enty sat in the front passenger seat. The Defendant sat in the seat in the second row of the van. Cooley sat in the third row of the van. Thompson then drove to the park.

The Defendant, Cooley, and Enty exited the van at Flanagan Park. The Defendant was wearing a white t-shirt and jeans. Cooley was wearing a dark shirt. Enty was wearing a white shirt and had braids. As the Defendant exited the van, he put an all black semi-automatic handgun in his waist. The gun was the same gun that the Defendant had grabbed earlier and Enty had wiped. Thompson then drove from the park to sell drugs.

About 10 to 15 minutes later, Thompson drove by Flanagan Park. He saw a police officer running to a body on the ground by the park's gate. He thought, "They did it." Thompson then drove to Second Street. He took the drugs out of the van and gave them to his sister in 619 Second Street. Thompson's grandmother saw Thompson hand the drugs to his sister. Thompson left house, drove the van down the street, and made a U-turn. He saw Enty riding on the handlebars of another person's bicycle. Thompson picked up Enty and drove back towards 619 Second Street. Thompson's grandmother was in the street, so Thompson stopped and let his grandmother in the van. Thompson drove to the Defendant's house and knocked on the door, but nobody answered. Thompson drove back to 619 Second Street, where he and his grandmother exited the van. Thompson went into 619 Second Street to get drugs to sell. He then left Second Street with Enty to sell drugs. While Thompson was driving the van, Enty was making calls to find out where the Defendant, Cooley, and Qu Mar Moore were.

6

Thompson and Enty arrived at the house of Dana Monroe (Monroe) at about 7:30 or 7:40 P.M. on July 9, 2012. The Defendant, Cooley, and Qu Mar Moore also arrived at Monroe's house. The Defendant told Thompson, "Bro, I caught my first body, and I'll do it again." Thompson, the Defendant, Cooley, Qu Mar Moore, and Enty left Monroe's house. At about 8:30 or 9:00 P.M., they arrived at the house of Moriah Close (Close). While at Close's house, Enty called Taylor because the Defendant and Cooley wanted to leave Williamsport. Taylor came Close's house, and the group agreed to meet Taylor later at the Walmart in Montoursville, Pennsylvania. Enty left Close's house with Taylor. At about 11:00 P.M. on July 9, 2012, Thompson, the Defendant, Cooley, and Qu Mar Moore met Taylor and Enty at the Walmart. The Defendant entered Taylor's vehicle and left with Taylor and Enty. Thompson, Qu Mar Moore, and Cooley returned to Close's house. Thompson gave Close $50 in cash and about $100 worth or heroin, so she would stay calm and not talk. Thompson and Cooley left Close's house, but Qu Mar Moore stayed there.

On July 10, 2012, Close sent text messages to Thompson. She told Thompson to get Qu Mar Moore out of her house because she had seen his picture in the paper. Qu Mar Moore left Close's house with Taylor's brother, Naheem.

### 7. Anita Jackson's Testimony

Anita Jackson (Jackson) knew Kevan Connelly, Braheem Connelly, the Defendant, and Qu Mar Moore. On July 9, 2012, Jackson took her son to Flanagan Park so he could play. Jackson was sitting on a bench in the park with Chantel Hunter (Hunter). Kevan Connelly and Braheem Connelly were arguing with the Defendant, Qu Mar Moore, and two males who Jackson did not know. One of the unknown males had twisties in his hair. Kevan Connelly and

7

the person with the twisties punched each other. She heard gun shots and saw a flash but did not see who fired the gun. She did not see the Defendant with a gun.

### 8. Antoine Manire's Testimony

Qu Mar Moore frequently came to the house of Antoine Manire (Manire). Qu Mar Moore would often let himself in Manire's house. Kadeem Alford also spent a lot of time in Manire's house. Kadeem Alford basically lived at Manire's house. The Defendant came to Manire's house but not often.

On March 2, 2012, Manire bought a silver and black Taurus .45 caliber semi-automatic handgun. He kept the gun in different places in his house. Manire believed that Kadeem Alford knew that Manire had a gun. At one point, Qu Mar Moore saw the gun. Qu Mar Moore was at Manire's house on July 8, 2012.

On July 10, 2012, Manire heard that the Defendant and Qu Mar Moore were wanted by police. Manire had last seen his gun on July 5, 2012. He checked the shelf where he had left his gun, but the gun was not on the shelf. He went to the police to report that his gun was missing.

### 9. Agent Kevin Stiles' Testimony

Kevin Stiles (Stiles) is a detective in the Williamsport Bureau of Police. Stiles reviewed footage from a camera on Second Street in Williamsport and a camera on a city bus. The footage was played for the jury. According to Stiles, the footage showed the following. At 6:31 P.M. on July 9, 2012, a gray Chrysler Town and Country mini-van parked on Second Street. Thompson exited the van using the driver's door. A male exited the van using the front passenger seat. The van's sliding door opened, but the footage did not show if anybody exited the van from the back. The person from the front passenger seat touched his waist and opened

8

the van's truck. He grabbed something white from the truck and manipulated something else with the white object. At 6:32 P.M., Thompson went to the front passenger side of the van and lifted a dashboard panel. At 6:35 P.M., Thompson entered the van and drove from Second Street. At 6:54 P.M., the van returned and was parked on Second Street. Thompson exited the van, walked on Second Street, and then entered an apartment. He exited the apartment at 6:58 P.M.

Four males other than Thompson walked onto Second Street. One entered the back of the van by opening the driver-side sliding door. One entered the van by using the front passenger-side door. One walked down Second Street and did not get into the van. Thompson entered 619 Second Street. The fourth male entered the van by using the driver-side sliding door. Thompson returned to the van at 7:01 P.M. At 7:02 P.M., the van left Second Street.

At 7:13 P.M., a city bus was in the area of Flanagan Park. People were running from the park. The right hand of one male was "held down to the right side of his waist." Stiles believed this male was one of the males who entered the van on Second Street. Another male's "left hand [was] holding onto his left side of his waist." Stiles believed this other male was another one of the males who entered the van on Second Street. Stiles believed that the video showed a third male from Second Street running from Flanagan Park.

At 7:19 P.M., the Chrysler van parked on Second Street. Thompson entered 619 Second Street. At 7:20 P.M., Thompson exited 619 Second Street and entered the van using the driver's door. The van went east on Second Street. Cynthia Lattimer (Lattimer), Thompson grandmother, exited 619 Second Street and went onto the street. The van was headed west on Second Street but stopped. At 7:21 P.M., Lattimer entered the van, and it left Second Street. At 7:31 P.M., the van returned to Second Street, where Thompson and Lattimer exited the van.

9

Lattimer entered 619 Second Street. At 7:32 P.M., Thompson entered the van using the driver's door. The van went west on Second Street.

### 10. Agent Trent Peacock's Testimony

Trent Peacock (Peacock) is a detective with the Williamsport Bureau of Police. Peacock watched the footage from the camera on the city bus. According to Peacock, the footage showed that three people had one of their hands at their waist and had only one of their arms swinging as they ran. Peacock testified that it is difficult to run with a gun. As a result of his training and experience, he formed the opinion that three individuals in the footage were carrying guns at their waists. Peacock also testified that the Defendant was 17 years old on July 9, 2012.

### 11. Agent Raymond Kontz's Testimony

Raymond Kontz (Kontz) is a detective with the Williamsport Bureau of Police. He was off duty on July 7, 2012 when he saw a large group of people in the middle of High Street in Williamsport. Kontz heard a lot of yelling, and the group appeared to be fighting. He heard one person say, "Give me a jawn." In Kontz's experience, "jawn" is a slang word for gun. At one point, the person who said "give me a jawn" was knocked down. Kontz believed that Kevan Connelly was the person who said "give me a jawn."

### 12. Officer Brian Aldinger's Testimony

Brian Aldinger (Aldinger) is an officer with the Williamsport Bureau of Police. On July 7, 2012, he was dispatched to a disturbance on High Street. It was reported that two men who may have been involved in the disturbance were walking on Park Avenue. Aldinger approached the two men on Park Avenue. They were Kevan Connelly and Braheem Connelly. Kevan

Connelly had a cut on his chin and was bleeding. He told Aldinger that he was elbowed during a basketball game.

### 13. Lieutenant Arnold Duck's Testimony

Arnold Duck (Duck) is an officer with the Williamsport Bureau of Police currently assigned to the Forensics Unit. Duck marked potential evidence in Flanagan Park after the shooting on July 9, 2012. Duck found four .45 caliber casings and two .40 caliber casings. He also found a .45 caliber bullet.

Duck collected potential evidence from the Chrysler van driven by Thompson. Duck noticed a compartment in the dashboard of the van. A dashboard panel could be lifted and under the panel there was a space. Duck testified that vans are not normally manufactured in a way that dashboard panels can be lifted.

### 14. Julia Brolley's Testimony

Julia Brolley (Brolley) is an expert in DNA analysis and currently employed by the Pennsylvania State Police – Greensburg. She received two swabs from .40 caliber casings and four swabs from .45 caliber casings. Brolley was unable to generate a DNA profile for any of the swabs.

### 15. Corporal Elwood Spencer's Testimony

Elwood Spencer (Spencer) is a forensic firearm examiner employed by the Pennsylvania State Police. Elwood received two discharged Winchester .40 Smith and Wesson cartridge cases. He also received four discharged Winchester .45 auto cartridge cases. In addition, he received four discharged bullets; three were from Kevan Connelly's autopsy, and one was from Flanagan Park.

11

Spencer determined that both .40 cases were discharged from the same firearm. He also determined that all of the .45 cases were discharged from same firearm.

Spencer determined that the four .45 cases, the bullet from Flanagan Park, and one bullet from the autopsy came from a silver and black Taurus semi-automatic PT 145 Millennium Pro Caliber .45 auto. Spencer could not determine whether the two other bullets came from the same gun, but he did determine that they did not come from the Taurus semi-automatic PT 145 Millennium Pro Caliber .45 auto.

### 16. Dr. Rameen Starling-Roney's Testimony

Dr. Starling-Roney is a board certified physician and the forensic pathologist who performed the autopsy of Kevan Connelly. Kevan Connelly was shot once in left shoulder, once in the right arm, and twice in the back. Dr. Starling-Roney determined that the cause of Kevan Connelly's death was multiple gunshot wounds.

### B. Witnesses Called by the Defendant

### 1. Tramane Moore's Testimony

Tramane Moore is the brother of Qu Mar Moore. Tramane Moore was in Flanagan Park on July 9, 2012. He saw Qu Mar Moore, the Defendant, Enty, and Cooley arguing with Kevan Connelly and Braheem Connelly. Tramane Moore saw Kevan Connelly and Enty punch each other. Tramane Moore heard gun shots, but he did not see who was shooting because people had walked up to the group and surrounded them.

### 2. Chantel Hunter's Testimony

Hunter was in Flanagan Park on July 9, 2012. She was with Jackson and Jackson's son. Hunter was sitting on a bench with Jackson when she heard an argument. The argument was to

12

the side of Jackson and Hunter, so Hunter had to turn to see it. Hunter saw Jackson turn and look at the argument. Kevan Connelly, Braheem Connelly, the Defendant, and a light-skinned black male with braids were arguing. Hunter turned back around and started talking with Jackson again. She did not pay attention to the argument. She was looking at Jackson, and Jackson was looking at her. Hunter heard gun shots while she was talking with Jackson. When the gun shots happened, Jackson ran to get her son. Hunter did not see anybody with a gun. She saw that Kevan Connelly was shot but did not see who shot him.

### 3. Scott Warner's Testimony

Scott Warner is a licensed private detective. Warner testified that shell cases from a semi-automatic gun usually eject six to eight feet from the shooter. Warner testified that cases do not usually eject as far as the cases were from where Hunter said the argument occurred. According to information provided by Hunter, Qu Mar Moore was closer than the Defendant to the location where the cases were found.

### 4. Moriah Close's Testimony

In the early evening of July 9, 2012, Thompson asked Close if his friends could stay at her house. About an hour after Thompson asked, Thompson, Cooley, Qu Mar Moore, and a light-skinned black male with braids came to Close's house. The Defendant was not at Close's house. Thompson's friends did not stay more than an hour except for Qu Mar Moore, who stayed the night. Thompson gave her $50 and about $100 worth of heroin, so Qu Mar Moore could stay the night. On July 10, 2012, Close saw Qu Mar Moore's picture in the news and told Thompson that Qu Mar Moore had to leave her house.

13

### 5. Kadeem Alford's Testimony

Kadeem Alford is the Defendant's brother. Kadeem Alford was at Manire's house almost every day and was almost like a family member. Qu Mar Moore was regularly at Manire's house but not as much as Kadeem Alford. The Defendant did not go to Manire's house often. Kadeem Alford did not know the last time the Defendant was at Manire's house. Kadeem Alford knew Manire had a gun license and heard Manire talking about getting a gun, but Kadeem Alford did not know if Manire had a gun. Kadeem Alford never saw a gun belonging to Manire. Qu Mar Moore never asked Kadeem Alford about Manire's gun. Qu Mar Moore never showed Kadeem Alford a gun belonging to Manire.

### C. Arguments of Post-Sentence Motion

The Defendant argues that the Commonwealth failed to offer sufficient evidence to support a conviction for First Degree Murder for the following reasons. It was unclear whether the Defendant possessed a .40 caliber all black handgun or a .45 caliber silver and black handgun. The Commonwealth did not present any evidence that the Defendant intended to kill Kevan Connelly.

The Defendant argues that the Commonwealth failed to offer sufficient evidence to support a conviction for Conspiracy to Commit Murder because "no evidence was presented to demonstrate that [the Defendant] and QuMar Moore had spoken prior to the shooting that day, that they communicated an agreement through communication of third parties, that either knew the other was coming to the park, that either knew the other had a weapon or that either had formulated a plan to shoot Kevan Connelly." The Defendant argues that since there was not a conspiracy in Commonwealth v. Kennedy,[6] there is not a conspiracy in his case. He contends

---

[6] 453 A.2d 927 (Pa. 1982).

14

that his actions and Qu Mar Moore's actions "amounted to joining into an affray spontaneously rather than pursuant to a common plan, agreement or understanding."

The Defendant argues that the Court's application of 18 Pa.C.S. § 1102.1 was unconstitutional under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Federal Constitution.

The Defendant argues that the imposition of the mandatory minimum sentence in 18 Pa.C.S. § 1102.1(a)(1) was unconstitutional under Alleyne v. United States[7] because the jury did not find that the Defendant was 15 years of age or older.

The Defendant argues that his sentence was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution because 18 Pa.C.S. § 1102.1 requires courts to ignore factors set out in Pennsylvania's Juvenile Act when sentencing a defendant. According to the Defendant, "the terms of 18 Pa.C.S. § 1102.1 seek to circumvent the protection provided to every juvenile offender and the directive provided to the court when imposing sentence on a juvenile offender that specific individual factors surrounding that juvenile offender be considered and a sentence be imposed specifically focusing on those factors as they relate to this specific defendant. As such, 18 Pa.C.S. § 1102.1 denies this specific class of offender equal protection under the laws of the United States and of the Commonwealth of Pennsylvania."

The Defendant argues that his sentence is unconstitutional under the Federal and State *Ex Post Facto* Clauses because the shooting occurred after the Supreme Court of the United States decided Miller v. Alabama[8] but before 18 Pa.C.S. § 1102.1 took effect.

---

[7] 133 S. Ct. 2151 (2013).
[8] 132 S. Ct. 2455 (2012).

15

The Defendant argues that 18 Pa.C.S. § 1102.1 is unconstitutional under the Original Purpose Clause and the Single Subject Clause of the Pennsylvania Constitution.

The Defendant argues that his sentence is manifestly excessive because the Court did not properly weigh and utilize the sentencing factors set forth in Miller v. Alabama. In addition, the Defendant argues that the Court considered factors beyond his control and did not properly weigh factors. He, therefore, requests that the Court reconsider his sentence.

## II. Discussion

## A. The Commonwealth Presented Sufficient Evidence to Support the Conviction for First Degree Murder.

Pennsylvania courts apply the following test to determine whether evidence is sufficient to support a conviction:

> The standard [Pennsylvania courts] apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, [a court] may not weigh the evidence and substitute [its] judgment for the fact-finder. In addition . . . the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Rivera, 983 A.2d 767, 770-71 (Pa. Super. 2009) (quoting Commonwealth v. Jones, 874 A.2d 108, 120-21 (Pa. Super. 2005)).

"In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice

and the specific intent to kill. The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body." Commonwealth v. Sanchez, 82 A.3d 943, 967 (Pa. 2013) (citations omitted).

Here, the Commonwealth offered sufficient evidence that the Defendant intended to kill Kevan Connelly. The Defendant returned to the park after an argument with Kevan Connelly. He returned with a gun and approached Kevan Connelly. He shot Kevan Connelly. After the shooting, he said, "I caught my first body, and I'll do it again." Such evidence is sufficient for a jury to find that the Defendant intended to kill Kevan Connelly.

There was also sufficient evidence to establish that the Defendant caused Kevan Connelly's death. The Defendant shot Kevan Connelly. Dr. Starling-Roney testified that Connelly died of multiple gunshot wounds. Thus, the Commonwealth presented sufficient evidence that the Defendant caused Kevan Connelly's death.

## B. The Commonwealth Presented Sufficient Evidence to Support the Conviction for Conspiracy to Commit Murder.

"To sustain a criminal conspiracy conviction, the Commonwealth must establish a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance." Commonwealth v. Weimer, 977 A.2d 1103, 1105-06 (Pa. 2009). "[A] conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt."

17

Commonwealth v. Knox, 50 A.3d 749, 755 (Pa. Super. 2012) (quoting Commonwealth v. McCall, 911 A.2d 992, 996-97 (Pa. Super. 2006)).

Here, from the circumstances, a jury could infer that the Defendant and Qu Mar Moore conspired to kill Kevan Connelly. The Defendant is correct that under Kennedy, "persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant a common plan, agreement, or understanding." 453 A.2d at 930. However, the circumstances show that neither the Defendant nor Qu Mar Moore joined an affray spontaneously. Both the Defendant and Qu Mar Moore knew that Kevan Connelly was at Flanagan Park. Both went to the park with a gun. Both were in the group that approached Kevan Connelly, and both shot Kevan Connelly. From these circumstances, a jury could infer that the Defendant and Qu Mar Moore conspired to kill Kevan Connelly. Therefore, the Commonwealth presented sufficient evidence to support the conviction for conspiracy to commit murder.

**C. 18 Pa.C.S. § 1102.1 is not Unconstitutional under the Cruel and Unusual Punishment Clause.**

In Commonwealth v. Lawrence,[9] the Superior Court of Pennsylvania held that 18 Pa.C.S. § 1102.1 "does not offend the Cruel and Unusual Punishment Clause of the Eighth Amendment." 99 A.3d at 122. Therefore, this issue has no merit.

**D. Any *Alleyne* Error was Harmless Because the Defendant Conceded the Fact Required for the Mandatory Minimum Sentence.**

"A person who has been convicted, after June 24, 2012, of a murder of the first degree . . . and who was under the age of 18 at the time of the commission of the offense shall be

---

[9] 99 A.3d 116 (Pa. Super. 2014).

18

sentenced as follows: [a] person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life." 18 Pa.C.S. § 1102.1(a)(1).

"Section 1102.1 does present an Alleyne problem." Lawrence, 99 A.3d at 123, n.11. In Lawrence, the Court found that any *Alleyne* error was harmless because the defendant conceded the fact required for the mandatory minimum. Id.

Here, the Defendant conceded that he was 17 years old on July 9, 2012. The following is an exchange between Defense Counsel and Agent Peacock, who was a witness called by the Commonwealth:

> **Defense Counsel**: Agent Peacock, on July 9th of 2012, do you know how old [the Defendant] was?
>
> **Peacock**: [The Defendant], I believe, was just a few days shy of his 18th birthday.
>
> **Defense Counsel**: Which is another way of saying that he was 17 years old?
>
> **Peacock**: Yes, sir.

N.T., 4/25/14, at 111. Because the Defendant conceded the fact required for the mandatory minimum, any *Alleyne* error is harmless.

**E. The Defendant's Sentence is not Unconstitutional under the Equal Protection Clause Because the Mandatory Sentence of 18 Pa.C.S. § 1102.1(a)(1) is Reasonably Related to a Legitimate Public Interest.**

The Defendant argues that 18 Pa.C.S. § 1102.1 requires the Court to ignore the factors in Section 6352 of Pennsylvania's Juvenile Act. When determining whether to impose a sentence

of life without parole on a juvenile convicted of first degree murder, a court is required to

consider and make findings on the record regarding the following:

(1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family.
(2) The impact of the offense on the community.
(3) The threat to the safety of the public or any individual posed by the defendant.
(4) The nature and circumstances of the offense committed by the defendant.
(5) The degree of the defendant's culpability.
(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.
(7) Age-related characteristics of the defendant, including:
    (i) Age.
    (ii) Mental capacity.
    (iii) Maturity.
    (iv) The degree of criminal sophistication exhibited by the defendant.
    (v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.
    (vi) Probation or institutional reports.
    (vii) Other relevant factors.

18 Pa.C.S. § 1102.1(d). Pennsylvania's Juvenile Act requires the following:

If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community.

42 Pa.C.S. § 6352(a).

Under 42 Pa.C.S. § 6352(a), a court has to consider public protection, the juvenile's

treatment, supervision, rehabilitation, welfare, accountability, and development of competencies.

Under 18 Pa.C.S. § 1102.1(d), a court has to consider public safety, the degree of culpability, the

nature and circumstances of the offense, the juvenile's maturity, mental capacity, prior history,

and probation or institutional reports. Although the two sections use different words, they have

the same effect. If a court considers the factors in 18 Pa.C.S. § 1102.1, it considers the factors in 42 Pa.C.S. § 6352. Therefore, the Court rejects the Defendant's argument that he was treated differently because the Court did not consider the factors in 42 Pa.C.S. § 6352.

The crux of the Defendant's argument appears to be that the sentence was unconstitutional because juveniles who are not convicted of murder are not subject to mandatory sentences. "The constitutional validity of duly enacted legislation is presumed. The party seeking to overcome the presumption of validity must meet a formidable burden." Commonwealth v. Haughwout, 837 A.2d 480, 487 (Pa. Super. 2003) (quoting Commonwealth v. Means, 773 A.2d 143, 147 (Pa. 2001)).

"The equal protection clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" Commonwealth v. Albert, 758 A.2d 1149, 1151, (Pa. 2000) (quoting U.S. Const. amend. XIV, § 1). "[T]he starting point of equal protection analysis is a determination of whether the State has created a classification for the unequal distribution of benefits or imposition of burdens." Commonwealth v. Parker White Metal Co., 515 A.2d 1358, 1363 (Pa. 1986). "[T]he test to be applied in equal protection cases, neither implicating rights fundamental under the Pennsylvania or United States Constitutions nor involving suspect classifications, is the 'rational basis' test." Commonwealth v. Lark, 504 A.2d 1291, 1298 (Pa. Super. 1986).

Here, the Defendant does not contend that he is in a suspect class or that a fundamental right is implicated. Therefore, the Court will apply the rational basis test. The rational basis test consists of the following two-step analysis:

First, [a court] must determine whether the challenged statute seeks to promote any legitimate state interest or public value. If so, [the court] must next determine whether the classification adopted in the legislation is reasonably related to accomplishing that articulated state interest or interests.

21

Albert, 758 A.2d at 1152. "In undertaking its analysis, the reviewing court is free to hypothesize reasons the legislature might have had for the classification. If the court determines that the classifications are genuine, it cannot declare the classification void even if it might question the soundness or wisdom of the distinction." Id.

It goes without saying that murder is a serious crime. "It demonstrates a disregard for . . . the life of the victim. It is a crime of archviolence." Commonwealth v. Middleton, 467 A.2d 841, 847 (Pa. Super. 1983). The legislature has a legitimate interest in forbidding and preventing murder. The imposition of the 35 year mandatory sentence under 18 Pa.C.S. § 1102.1(a)(1) is reasonably related to this interest. The sentence punishes those who commit murder and helps to deter others from committing murder. Therefore, the sentence is reasonably related to a legitimate public interest. The Defendant "does not argue that a national consensus exists against imposing a sentence of 35 years to life imprisonment upon a juvenile." Lawrence, 99 A.3d at 121, n.10.

**F. The Defendant's Sentence is not Unconstitutional under the Federal and State *Ex Post Facto* Clauses Because the Court Applied the Law in Existence at the Time of the Offense.**

In Commonwealth v. Batts,[10] the Supreme Court of Pennsylvania offered the following instruction on sentencing juveniles who are convicted of first or second degree murder:

> We recognize the difference in treatment accorded to those subject to non-final judgments of sentence for murder as of *Miller's* issuance and those convicted on or after the date of the High Court's decision. As to the former, it is our determination here that they are subject to a mandatory maximum sentence of life imprisonment as required by Section 1102(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing. Defendants in the latter category are subject to high mandatory minimum sentences and the possibility of life without parole, upon evaluation by the sentencing court of criteria along the lines of those identified in *Miller*.

---

[10] 66 A.3d 286 (Pa. 2013).

22

66 A.3d at 297.

Miller was decided on June 25, 2012. *See* 132 S. Ct. 2455. Because Miller was decided before the Defendant shot and killed Kevin Connelly, the Court was required to evaluate criteria along the lines of those identified in Miller. In Knox, the Superior Court discussed the requirements of Miller:

> [A]t a minimum [a court] should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

50 A.3d at 745. The Court has already cited the factors to be considered under 18 Pa.C.S. § 1102.1(d). Such factors include age, metal capacity, maturity, circumstances of the offense, degree of culpability, degree of criminal sophistication, criminal history, and probation or institutional reports. Although 18 Pa.C.S. § 1102.1(d) is worded differently than Knox, it has the same effect as Knox. Therefore, when a court considers the factors in 18 Pa.C.S. § 1102.1(d), it meets the requirement of evaluating criteria along the lines of Miller. Because the Court considered those factors consistent with the reasoning in Miller, it applied the law in existence at the time that the Defendant shot and killed Kevan Connelly. Thus, the sentence is not unconstitutional under the Federal and State *Ex Post Facto* Clauses.

**G. 18 Pa.C.S. § 1102.1 is not Unconstitutional under the Original Purpose Clause and Single Subject Clause of the Pennsylvania Constitution.**

In Commonwealth v. Brooker,[11] a juvenile was sentenced under 18 Pa.C.S.A. § 1102.1. 103 A.3d at 329. "[T]he final version of Act 204 created Section 1102.1 . . . ." Id. at 337. The

---

[11] 103 A.3d 325 (Pa. Super. 2014).

23

juvenile argued that 18 Pa.C.S.A. § 1102.1 violated the Original Purpose Clause and Single Subject Clause of the Pennsylvania Constitution. Id. at 329-30. The Superior Court held that the juvenile was "not entitled to relief under the Original Purpose Clause." Id. at 336. It also held that "Act 204 does not violate the Single Subject Clause." Id. at 338.

## H. The Defendant's Sentence is not Excessive Because the Court Considered the Factors in 18 Pa.C.S. § 1102.1(d).

The Defendant's sentence is not excessive because the Court considered the factors in 18 Pa.C.S. § 1102.1(d). *See* N.T., 11/10/14, at 114-21. The Court also reviewed a pre-sentence investigation report. Id. at 3-8.

## III. Conclusion

The Commonwealth presented sufficient evidence to support the conviction for First Degree Murder. The Commonwealth presented sufficient evidence to support the conviction for Conspiracy to Commit Murder. The Superior Court has held that 18 Pa.C.S.A. § 1102.1 is not unconstitutional under the Cruel and Unusual Punishment Clause. Any *Alleyne* error was harmless because the Defendant conceded the fact required for the mandatory minimum sentence. The Defendant's sentence is not unconstitutional under the Equal Protection Clause because the mandatory sentence of 18 Pa.C.S.A. § 1102.1(a)(1) is reasonably related to a legitimate public interest. The Defendant's sentence is not unconstitutional under the Federal and State *Ex Post Facto* Clauses because the Court applied the law in existence at the time of the offense. The Superior Court has held that 18 Pa.C.S.A. § 1102.1 is not unconstitutional under the Original Purpose Clause and Single Subject Clause of the Pennsylvania Constitution. The

24

Defendant's sentence is not excessive because the Court considered the factors in 18 Pa.C.S.A. § 1102.1(d).

## ORDER

AND NOW, this 27th day of February, 2015, based on the foregoing Opinion, it is ORDERED and DIRECTED that the Defendant's Post-Sentence Motion is hereby DENIED. Pursuant to Pennsylvania Rule of Criminal Procedure 720(B)(4), the Defendant is hereby notified of the following: (a) the right to appeal this Order within thirty (30) days of the date of this Order; (b) the right to assistance of counsel in the preparation of the appeal; (c) if indigent, the right to appeal in forma pauperis and to proceed with assigned counsel as provided in Pennsylvania Rule of Criminal Procedure 122; and (d) the qualified right to bail under Pennsylvania Rule of Criminal Procedure 521(B).

By the Court,

Nancy L. Butts, President Judge

cc:    Donald F. Martino, Esq.
       DA

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA :
:
:
v. : No. CR: 1969-2012
: CRIMINAL DIVISION
:
RAYMARR ALFORD, :
Defendant :

## OPINION AND ORDER

The Defendant filed a Motion in Limine on December 23, 2013. A hearing on the Motion was held February 20, 2014.

*Background*

On July 9, 2012, at around 7:00 PM, Kevan James Connelly (victim) was shot to death at Flanagan Park, 707 Memorial Avenue. The Commonwealth intends to introduce a surveillance video of Second Street approximately forty-five (45) minutes before the shooting. The video depicts a gray/teal mini-van parallel parking on the street. The driver, who the Commonwealth identified as Shariff Thompson (Thompson), parked the vehicle and left the view of the camera. While passengers of the vehicle could not be viewed, the movements of car doors indicate that there were at least three (3) individuals in the vehicle. Later, Thompson is shown re-entering the front passenger side of the vehicle, opening up an alleged hidden compartment on the front-passenger side of the dashboard, and again exiting. The Commonwealth intends to call Agent Trent Peacock (Peacock) of the Williamsport Bureau of Police to testify that the way Thompson grabbed for the object in the hidden compartment is the manner in which an individual would grab for a firearm. Finally, the surveillance camera shows Thompson re-enter the driver side of the vehicle and drive the vehicle down Second Street and out of view of the surveillance camera.

In addition, the Defendant is opposed to testimony the Commonwealth intends to use for

a surveillance video from a city bus. The video shows many locations inside and outside of the bus. The angle relevant to this Motion is video pointing outward from the front of the bus, which shows the eastern edge of Flanagan Park at the time of the shooting. The video depicts multiple people running away from the park, including two (2) individuals that are each holding one of their hands by their waist as they run. The Commonwealth intends to call Peacock to identify the Defendant and to explain that he and another individual were running and holding their hands as if they were in possession of a firearm.

On December 22, 2013, the Defendant filed a Motion in Limine to Prohibit the Commonwealth's Witnesses From Narrating Surveillance Videos And Specifically From Identifying Items Allegedly Depicted. The Defendant alleges that permitting Peacock's testimony "would violate the mandates of Pennsylvania Rule of Evidence 701 and Pennsylvania Rule of Evidence 901. The Commonwealth disagrees and argues that Peacock will testify regarding non-readily apparent aspects of the videos and that the jury can weigh his credibility.

***Whether Peacock may testify regarding details about the surveillance videos***

The Commonwealth contends that Peacock does not have any firsthand knowledge of the surveillance videos and will merely be explaining the video to events he did not witness. The Pennsylvania Rules of Evidence states the following relevant sections:

Rule 701. Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) Rationally based on the witness's perception;
(b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) Not based on scientific, technical, or other specialized knowledge

2

within the scope of Rule 702.

Rule 901. Authenticating or Identifying Evidence

   (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
   (b) Examples. The following are examples only—not a complete list—of evidence that satisfies the requirement:
       (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.

Pa.R.E. 701, 901.

In support of his position, the Defendant cites to Harris, where a surveillance video was shown to the jury at trial. Commonwealth v. Harris, 884 A.2d 920, 922 (Pa. Super. 2005). The video depicted the defendant pulling an object from his back pocket, standing over the victim, and running down Woodland Avenue. At the time the camera was recording the defendant, two officers heard gun shots and responded to the scene and saw the defendant running down Woodland Avenue. The officers followed and apprehended the defendant.

The issue in that case was whether the trial court erred in denying a Kloiber instruction in regards to the video, which was a nighttime video and not clear enough to make out the features of the assailant. Id. at 932; see Commonwealth v. Kloiber, 106 A.2d 820 (Pa. 1954) (instructing a jury that an eyewitness' identification should be viewed with caution where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past). Citing Pa.R.E. 901, the Superior Court of Pennsylvania found that a Kloiber instruction was not needed. "Officer Gallen-Ruiz authenticated the contents of the videotape, and the trial court properly admitted the tape into evidence. See Pa.R.E. 901(b)(1). We agree a Kloiber instruction was not necessary in

3

the instance case." Harris, 884 A.2d at 933.

The Defendant contends that Harris holds that "a jury's viewing of a surveillance video was preferable to a witness with no first-hand knowledge testifying to what they believed the video depicted . . ." The Court does not agree with the Defendant's argument and at the very least the case does not preclude an individual from testifying about a video without firsthand knowledge. The Superior Court was dealing with whether a Kloiber instruction was warranted and in doing so stated that "a cautionary instruction with regard to the videotape was not necessary in the instant case." Id.

Moreover, the Defendant argues that Shabazz further prohibits the Commonwealth from having Peacock testify regarding the surveillance videos. In Shabazz, a co-conspirator that was at the scene of a robbery identified the defendant in a surveillance video. United States v. Shabazz, 564 F.3d 280 (3rd Cir. 2009). The defendant argued that the jury was capable of determining for themselves whether he was the man in the surveillance footage. Id. at 287. The Third Circuit of Appeals stated that this was not an occasion "where a witness is asked to identify the defendant in an incriminating photo or video based simply on general familiarity with the defendant's appearance." Id. The co-conspirator narrated the video for only the incidents he was an eyewitness for and therefore it was found that he was admissible as an ordinary fact witness.

Once again, the Court is not persuaded by the Defendant's argument that Shabazz held that only fact witnesses can testify regarding surveillance videos. The Third Circuit merely found that the co-conspirator was a fact witness, in that he testified to only facts that he saw. Importantly, the Third Circuit cited to cases where witnesses were asked to identify the defendant in an incriminating video "based simply on general familiarity with the defendant's appearance."

4

Id. In these cases, which the Defendant also argued, the federal courts would consider four (4) relevant factors:

> (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or when the defendant was dressed in a manner similar to the individual depicted in the photograph; (3) whether the defendant had disguised his appearance at the time of the offense; and (4) whether the defendant had altered his appearance prior to trial.

United States v. Dixon, 413 F.3d 540, 544 (6th Cir. 2005). "Other important factors are the degree of clarity of the surveillance photograph and the quality and completeness with which the subject is depicted in the photograph." Id.

In LaPierre, an officer investigating bank robberies testified that the individual pictured in bank surveillance photographs was the defendant. United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir. 1993). The Ninth Circuit found that officer's testimony was not proper under FRE 701 because the defendant looked the same at trial as at the time of the robbery, the officer had never met the defendant until his investigation, and that the officer based part of his opinion on *witness statements.* The Ninth Circuit stated that there must be a reason to believe that the witness is more likely to correctly identify the person than the jury, whether it is from past contacts or whether the defendant's appearance had changed.

The main problem with the Defendant's argument, however, is that it relies heavily on federal law. The Commonwealth, focusing on Pennsylvania law, argues that the testimony would be admissible if it is helpful to the jury and not readily apparent. In McKellick, an officer pulled over the defendant's vehicle for traffic violations, suspected a possible DUI, conducted Standardized Field Sobriety Tests, and arrested the Defendant for DUI. Commonwealth v.

5

McKellick, 24 A.3d 982 (Pa. Super. 2011). The officer was subsequently killed in an unrelated incident. At trial for the DUI, the Commonwealth had one officer testify about downloading the video of the incident from the recording equipment in the police vehicle. A second officer testified regarding the video, identified the defendant, described the field sobriety tests, and narrated the defendant's performance of the tests. Id. at 989. The Superior Court found that the testimony and video were properly admitted at trial:

> In light of the aforementioned testimony, we find that the Commonwealth sufficiently authenticated the videotape. Corporals Riehl and Hothouse demonstrated they were persons with knowledge of what the evidence was proclaimed to be, Appellant's traffic stop, and the trial court, as the finder of fact, was free to believe or disbelieve Corporal Hothouse's depiction of the events thereon and whether the videotape accurately and fairly represented Trooper Miller's contact with appellant on November 12, 2008.

Id. The Superior Court did not apply a specific test in determining the admissibility but did note that the witnesses had knowledge and that the jury was free to believe or disbelieve the testimony.

In addition, the Commonwealth cites to Spencer, where a witness viewed a surveillance tape and testified that the gait of the individual was the same as the defendant. Commonwealth v. Spencer, 639 A.2d 820 (Pa. Super. 1994). The Superior Court applied the following approach:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Id. at 824. The witness was the defendant's parole officer and had known him for a year. Further, the witness testified that the defendant had a distinctive and easily recognized gait when he walked. The Superior Court found that "the witness's opinion that the gaits of the robber and appellant were similar was rationally based on her perception and was essential to a clear

6

understanding of her testimony." Id.

Based on all the law reviewed, this Court will substantially rely on the Pennsylvania law and specifically the approach used in Spencer. However, Pennsylvania law is very limited on the issue at hand. This Court was unable to find any cases on point besides the ones provided by the Commonwealth. Therefore, this Court will still consider the federal law as far as it provides guidance with Pennsylvania law.

The first issue is whether the testimony from Peacock will be rationally based on his perception. The testimony proposed by the Commonwealth is unique depending on the video and what Peacock proposes to testify. The video of Thompson reaching for an object in the hidden compartment of his van garners testimony from Peacock that is based on his training and experience. Peacock would testify that Thompson is reaching for the object the same way someone would reach for a firearm. Similarly, the testimony regarding the Defendant running with his hand on his waist is also based on training and experience. This testimony is based on the perception of the witness and this Court believes is consistent with McKellick and Spencer.

The testimony of Peacock identifying the Defendant on the bus surveillance video, however, is a hybrid of his perception and the perception of others. The Commonwealth provided a proffer to this Court that Peacock's identification of the Defendant would be based on his prior contacts with the Defendant and a description of the Defendant from other witnesses. Based on the case law, descriptions made by other witnesses are not the perception of Peacock. If the officer's identification was made solely on his prior contacts with the Defendant this Court would find it admissible. However, as Peacock's testimony is based partially on the perception of others, this Court finds that the testimony proffered by the Commonwealth is not admissible.

7

See Pa.R.E. 701 ("rationally based on the witness's perception."). Whether Peacock would still make the same identification based only on his previous contacts with the Defendant is still a possibility and not being precluded by this Court's Opinion.[1]

The second factor analyzed by the Superior Court in Spencer was whether the witness' testimony was helpful to the clear understanding of the testimony or the determination of a fact in issue. As argued by the Commonwealth, this Court agrees that the testimony of Peacock clarifies facts that are not readily apparent by just plainly watching the surveillance videos. When Thompson returned to the van he appears to open up a compartment and grab an object. Without the testimony of Peacock, it would not be clear that the compartment was hidden, which officers further discovered after a search warrant of the vehicle. Also, the testimony would further explain what Thompson was possibly gathering from the compartment based not only on how he reached for it but also the experience and training of Peacock. Similar arguments can be made about the bus surveillance video of two (2) people running while keeping a hand on their waist in a particular way. The relevant portion of the video would not be apparent because of the low quality of the video and that it shows numerous other people running.

Finally, the jury will be allowed to determine the credibility of Peacock's testimony. The basis for Peacock's opinions will be stated to the jury. Further, defense counsel has an opportunity to cross-examine him and attack the basis for his opinions. Therefore, this Court believes that there is little to no prejudice against the Defendant for Peacock's testimony regarding the surveillance videos.

---

[1] Federal law also focuses on the perception of the witness. In LaPierre, addressed above, the Ninth Circuit found that an officer's identification based on witness reports and pictures of the defendant after the robbery was not admissible at trial. While Peacock's testimony is partially based on witness reports, the Court does not know whether his identification can be made solely on his previous contacts with the Defendant.

Circulated 11/24/2015 02:47 PM

## ORDER

AND NOW, this ___10th___ day of March, 2014, after a hearing and based upon the foregoing Opinion, Defendant's Motion in Limine is hereby GRANTED in part and DENIED in part. The Court finds that the identification of the Defendant in the city bus surveillance video is cumulatively based on the perception of the officer and of other witnesses and therefore is inadmissible as proffered by the Commonwealth. The Court, however, finds that all additional testimony by Peacock regarding Shariff Thompson reaching for an object inside his van as well as two individuals running from the scene of the shooting on the bus surveillance video is of his own perception and helpful to the trier of fact.

By the Court,

Nancy L. Butts, President Judge

xc:   Eric Linhardt, Esq.
      Ken Osokow, Esq.
      Donald Martino, Esq.

FILED
~~TYCOMING COUNTY~~

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA '5 MAY 11 PM 2 26 : CR-1969-2012

                            :

v.         ~~DANIEL R. PEUBLE~~ :
        ~~PROTHONOTARY &~~ :
RAYMARR DAQUAN ALFORD, ~~CLERK OF COURTS~~ :    CRIMINAL DIVISION
      Defendant                   :    1925(a) Opinion

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

For the Defendant's first and second issues, the Court will rely on its Opinion filed on March 3, 2015. For the Defendant's third issue, the Court will rely on its Opinion filed on May 1, 2013. For the Defendant's fourth and fifth issues, the Court will rely on this Opinion. For the Defendant's sixth, seventh, eighth, ninth, and tenth issues, the Court will rely on its Opinion filed on March 3, 2015.

## I. The Court did not Err in Allowing a Witness to Describe the Actions of Individuals in a Bus Surveillance Video and Allowing Another Witness to Identify the Individuals in the Video.

In his fourth issue, the Defendant argues that the Court "erred by permitting Commonwealth witnesses Shareef Thompson and Agent Trent Peacock to identify for the jury persons they believed were depicted on a bus surveillance video and to describe those persons' actions." Agent Peacock did not identify the individuals in the bus video. See N.T., 4/25/14, at 89-92. Peacock did, however, describe the actions of the individuals in the video. See id. For the issue of Peacock describing the actions, the Court will rely on its Opinion filed on March 6, 2014.

Shareef Thompson did not describe the actions of the individuals in the bus video. He did, however, identify the individuals. See N.T., 4/23/14, at 176-77. "Lay opinion identification

testimony is more likely to be admissible, for example, where the surveillance photograph is of poor or grainy quality, or where it shows only a partial view of the subject." United States v. Dixon, 413 F.3d 540, 545 (6th Cir. 2005). Under Pennsylvania Rule of Evidence 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.E. 701.

Here, the video did not clearly show the individuals. However, the jury saw the video, so it was in a position to determine whether anybody could have recognized the individuals. See Commonwealth v. Harris, 884 A.2d 920, 933 (Pa. Super. 2005) (quoting trial court's opinion that Kloiber instruction was not needed in part because the jury was in an adequate position to determine whether the video image of [the defendant] was unrecognizable). The Commonwealth laid a foundation for how Thompson was able to identify the Defendant, Enty, and Cooley as being the individuals in the video. Thompson had known the Defendant for about 10 years before the video. N.T., 4/23/14, at 113. Cooley was a friend who Thompson knew from school. Id. Thompson had known Enty for two months before the video. Id. at 113-14. The Commonwealth also established that the identifications were based on Thompson's perception. Thompson recognized the Defendant from "his shirt, his jeans, and how dark he is." N.T., 4/23/14, at 176. He recognized Enty because "he had on the same white T-shirt and pants [as the Defendant], but [was] lighter than [the Defendant]." Id. 176-77. Thompson also recognized Enty from the "twisties" in his hair. Id. at 177. Thompson recognized Cooley because "that day he had on a black T-shirt and shorts." Id.

Thompson's identification testimony was helpful to determining the identities of the shooters since it put certain individuals near the location of the shooting shortly after the

shooting. Finally, Thompson did not present any scientific, technical, or other specialized knowledge of the type that is precluded under Rule 701. Because Thompson's identifications of the individuals in the video meet the criteria of Rule 701, the Court did not err in permitting the identification testimony.

## II. The Court did not Err in Allowing the Commonwealth to Play a Recorded Phone Call Involving Anita Jackson and Her Brother.

In his fifth issue, the Defendant argues that the Court "erred by permitting the Commonwealth to introduce recorded prison phone calls during the trial." The Commonwealth played a recorded phone call involving Anita Jackson and her brother, who was in prison at the time of the call. "In an effort to ensure that only those hearsay declarations that are demonstrably reliable and trustworthy are considered as substantive evidence, we now hold that a prior inconsistent statement may be used as substantive evidence only when the statement is given under oath at a formal legal proceeding; or the statement had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements." Commonwealth v. Lively, 610 A.2d 7, 10 (Pa. 1992).

"[W]hen the prior inconsistent statement is a contemporaneous verbatim recording of a witness's statement, the recording of the statement must be an electronic, audiotaped or videotaped recording in order to be considered as substantive evidence. This will ensure that the requisite degree of reliability demonstrated will be similar to instances in which the statement was given under oath at a formal legal proceeding or the statement is reduced to a writing signed and adopted by the declarant." Commonwealth v. Wilson, 707 A.2d 1114, 1118 (Pa. 1998).

Jackson made inconsistent statements because, during trial, she testified that she did not see who fired the gun, but, during the phone call, she said that she saw the Defendant shoot Kevan Connelly. See N.T., 4/22/14 (under a separate cover), at 13. Before the call was played

3

for the jury, Jackson testified that she did not recall telling her brother about the shooting in a phone call on the day after the shooting. Id. at 14-15. At sidebar, the Defendant's attorney did not dispute that Jackson was involved in the phone call:

> "The fact that she made a phone call is not at issue, but the content of the phone call I think is."

N.T., 4/22/14 (under a separate cover), at 17. Because the Defendant's attorney did not dispute that Jackson was involved in the call and Jackson's statements were audiotaped contemporaneously with her making the statements, the Court properly admitted Jackson's statements as substantive evidence.

Even if Jackson's statements are not inconsistent statements that can be considered substantive evidence, they were properly admitted under the excited utterance exception to the hearsay rule. An excited utterance is:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

Commonwealth v. Keys, 814 A.2d 1256, 1258 (Pa. Super. 2003) (quoting Allen v. Mack, 28 A.2d 783, 784 (Pa. 1942)). The following is considered in determining whether a statement is an excited utterance:

> 1) whether the declarant, in fact, witnessed the startling event; 2) the time that elapsed between the startling event and the declaration; 3) whether the statement was in narrative form (inadmissible); and, 4) whether the declarant spoke to others before making the statement, or had the opportunity to do so. These considerations provide the guarantees of trustworthiness which permit the admission of a hearsay statement under the excited utterance exception. It is important to note that none of these factors, except the requirement that the declarant have witnessed the startling event, is in itself dispositive. *Rather, the factors are to be considered in all the surrounding circumstances to determine whether a statement is an excited utterance.*

Id. (quotations and citations omitted). "The crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." Id.

Here, Jackson witnessed the shooting. She was in the park and saw the Defendant arguing with Kevan Connelly and Braheem Connelly. N.T., 4/22/14 (under a separate cover), at 8-10. She heard gun fire and saw that her son was in the crossfire. Id. at 12-13. Finally, Jackson saw that Kevan Connelly had been shot. Id. at 13.

Jackson had the phone conversation with her brother the day after the shooting. During the conversation, Jackson talks very quickly and has an excited tone. Her statement that she saw the Defendant shoot Kevan Connelly is not in response to a question. When listening to the call, it is apparent that Jackson's excitement continued to dominate while her reflective processes remained in abeyance. Therefore, the call was properly admitted under the excited utterance exception to the hearsay rule.

## III. Conclusion

For the forgoing reasons, the Court respectfully requests that its Order of November 10, 2014 be affirmed.

DATE: 8 May 2015

By the Court,

Nancy L. Butts, President Judge

cc:     Donald F. Martino, Esq.
        DA

5